# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
March 6, 2013 Session

## SHANTHA GRACE PANDIAN v. JUAN FRANCISCO RODRIGUEZ

**Appeal from the Circuit Court for Washington County**
**No. 2899B     Jean Stanley, Judge**

_____

**No. E2012-00487-COA-R3-CV-FILED-APRIL 23, 2013**

_____

This appeal arises from a dispute over a parenting plan.  Shantha Grace Pandian ("Mother") sued Juan Francisco Rodriguez ("Father") for divorce in the Circuit Court for Washington County ("the Trial Court").  The Trial Court granted the parties a divorce.  The case then proceeded to focus on a parenting plan for the parties' two children, Christopher and Ethan (collectively, "the Children"), both boys with different special needs.  Father requested equal time with the Children on a weekly alternating basis.  Mother, on the other hand, wanted to have the Children most of the time, and argued that Father's plan would be too disruptive for the Children.  The Trial Court entered a parenting plan designating Mother as the primary residential parent and granting her most of the time with the Children.  Father appeals, arguing that the Trial Court should have adopted his proposal for equal custodial time with the Children.  We affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and JOHN W. MCCLARTY, J., joined.

Thomas F. Bloom, Nashville, Tennessee, for the appellant, Juan Francisco Rodriguez.

Mark D. Slagle, Johnson City, Tennessee, for the appellee, Shantha Grace Pandian.

# OPINION

## Background

Mother and Father, both physicians, were married in April 1998. The parties' first son, Christopher, was born in July 2001. In November 2003, a second son, Ethan, was born. In December 2010, Mother sued Father for divorce. In January 2011, the Trial Court entered a Temporary Parenting Plan designating Mother as the primary residential parent with Father to have residential custody of the Children for 103 days per year. Father, however, wanted equal time with the Children for the final plan. The Trial Court granted the parties a divorce, and the parties settled all other matters save for child support and child custody. This appeal solely concerns Father's request to have equal time with the Children. A hearing relative to this issue was held in the Trial Court in January 2012, and the principal witnesses were Mother and Father.

Mother, 39, testified. Mother is a physician employed at the James H. Quillen VA Medical Center. Mother is a board-certified psychiatrist. Mother's parents, who lived one street or so away and played a significant role in the upbringing of the Children, were from India. Mother received part of her schooling in India. Mother met Father at a Kaplan Review Board Course in Minnesota, and the two married in 1998. After their marriage had ended, Mother and Father continued to work in the same medical center, albeit in different clinics.

Mother testified to certain developmental issues concerning the parties' older son, Christopher. According to Mother, Christopher suffers from speech delay, has a lot of anxiety, and requires a great deal of structure in his life as a result of his issues, which include attention deficit hyperactivity disorder and anxiety disorder. Mother stated "[Father's] participation in the treatment evaluation recommendations, on-going assessments, have been minimal." When Christopher was born, Father initially was in Florida working at a fellowship but later did participate in Christopher's treatment. Christopher saw a developmental pediatrician, and both parents attended these sessions. Christopher also underwent occupational therapy. Christopher saw a psychiatrist as well, and, according to Mother, Father attended "a few appointments." Mother also testified about the parties' younger son, Ethan, and his own particular special needs. Mother stated that Ethan is a very intelligent child who requires challenges, and his educational environment is suited accordingly. Mother generally was critical of Father's participation in the treatment of the Children's special needs. Additionally, Mother asserted that Father struck her on two occasions, and also cursed at her in front of the Children.

One of the major points of contention in this case was Father's practice of "moonlighting," or, working extra jobs, during the marriage. Mother testified to Father's practice of moonlighting:

Once he got the job with the VA - - one of the - - my position at the VA is clinical and administrative. I'm chief of the outpatient clinic, of the mental-health clinic. And this is where I think a little bit of the culture ties into some of the dynamics in the relationship. It was difficult I think. I earned more money than him at times or he was unemployed at times. So, one of the things I know that we had talked about that was important to him during the marriage was him being able to moonlight and work the extra jobs and bring in extra income, and to make his total salary more than mine at the time. That frequency, especially in the last two to three years, the frequency of the moonlighting increased. On an average week, he was working two week-nights, two to three week-nights - - I would say two, in an outpatient clinic; and every weekend was taking call at a facility in Lebanon or going to another place to take care of - - so, every weekend.

\*\*\*

[A]t times I have had the discussion with him that this moonlighting was coming at a cost in terms of his family-life and spending time with the children. And I was afraid that it wasn't - - to me, and I had vocalized that to him, it was not worth it. We didn't need the money.

Father, 50, also testified. Father, a geriatric psychiatrist, was from the Dominican Republic. Father stated that apart from a 13 month period when he was completing a fellowship in Tampa, Florida, he was very much involved in the upbringing of both of the Children. According to Father, the family used to take trips to places such as Dollywood and the zoo. Father testified to his introducing the Children to the Kumon educational program, as well as "Kung Fu."

Father contradicted Mother's accounts of his moonlighting. Father testified that his moonlighting, at its peak, took him away from the family around twenty to thirty hours a month. According to Father, Mother never complained about his moonlighting and actually enjoyed the extra income. Father testified that after separating from Mother, he has been able to curtail his moonlighting. Apart from his work with Harvest Ministries, which requires around six hours every four months, Father had completed his earlier moonlighting obligations. Father asserted that he had flexibility and was prepared to be available to the Children on a weekly alternating basis, and to attend to their special needs. Father described

how he assisted the Children with their homework and got them involved in sports. Father denied Mother's allegations of violence towards her.

On cross-examination, Father testified to his involvement with the Children and how certain activities sometimes interfered:

Q: Are you enjoying the time you spend with the children now?

A: This is good, definitely.

Q: Is it more than you have ever spent with them in long extended periods of time since they were born?

A: No. I have always spent time with my kids.

Q: Well, you really couldn't have when you were down in Tampa.

A: No, but that was Christopher, and I was there for a year doing fellowship.

Q: And while you were studying for these exams, you couldn't have been playing with them.

A: No, because I was studying at home and mainly it was during the evening, not during the day; of the evening.

Q: And when you were working Tuesdays, Thursdays, and Saturdays and driving up into Virginia, you weren't spending time with them.

A: Those were Tuesdays and what is it? It was only two hours, and one Saturday a month was 6 to 8 hours.

The Trial Court declined to grant Father's request for equal residential time with the Children. In February 2012, the Trial Court entered its final order, finding and stating in relevant part:

The Court finds that Mother was the primary caregiver and decision maker for the parties' children. The Court finds that Father is perfectly capable of caring for the parties' children, and there is no reason that he cannot become a bigger part of the children's lives. Father has requested that the

residential parenting time be divided equally between the parties. The Court finds that this is not in the best interest of the parties' children but will grant additional time to Father on a week to week basis in the summer months when the children are out of school and adjust the parties' schedule with their children during the school year so as to maintain the consistency of the children's activities during the school year.

The Trial Court, in its oral ruling incorporated into its final order, explained in part:

> I am not going to change it to a 50/50 schedule, I'm not going to do that. There's no doubt that mom was the primary care-giver, she was the decision-maker, she was the mover, she was the shaker, she was the one that got it done, she was in charge of these kids. That's not necessarily a bad thing, that's the way some families work. But for whatever reason, dad decided to work overtime, he decided to moonlight, he had to study to take care of his Boards. He was not there like mom was. However, that being said, he is perfectly capable of caring for these kids. As far as I can tell, there's no reason he cannot become a bigger part of their lives. It's up to him to prove me wrong on that because I'm going to give you a chance to do it.

The Trial Court entered a parenting plan that designated Mother as the primary residential parent of the Children. The parenting plan granted Father 134 days per year of residential time with the Children with parenting time on alternating weekends from Friday through Monday morning, overnight time on alternating Tuesdays, and after-school time on other Tuesdays. During the summer, Father would have the Children on an alternating weekly basis. Father filed a timely appeal to this Court.

## Discussion

Though not stated exactly as such, Father raises one issue on appeal: whether the Trial Court erred in declining to enter a parenting plan providing for equal custodial time with the Children between these parents on an alternating weekly basis.

We review a trial court's decisions regarding custody and visitation for abuse of discretion. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). As our Supreme Court has instructed:

> It is not the function of appellate courts to tweak a visitation order in the hopes of achieving a more reasonable result than the trial court. Appellate courts correct errors. When no error in the trial court's ruling is evident from

the record, the trial court's ruling must stand. This maxim has special significance in cases reviewed under the abuse of discretion standard. The abuse of discretion standard recognizes that the trial court is in a better position than the appellate court to make certain judgments. The abuse of discretion standard does not require a trial court to render an ideal order, even in matters involving visitation, to withstand reversal. Reversal should not result simply because the appellate court found a "better" resolution. *See State v. Franklin*, 714 S.W.2d 252, 258 (Tenn. 1986) ("appellate court should not redetermine in retrospect and on a cold record how the case could have been better tried."); *cf. State v. Pappas*, 754 S.W.2d 620, 625 (Tenn. Crim. App. 1987) (affirming trial court's ruling under abuse of discretion standard while noting that action contrary to action taken by trial court was the better practice); *Bradford v. Bradford*, 51 Tenn. App. 101, 364 S.W.2d 509, 512-13 (1962) (same). An abuse of discretion can be found only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record. *See, e.g., State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000).

*Id*. at 88. The guiding principle in custody and visitation matters is the best interest of the child. *Miller v. Miller*, 336 S.W.3d 578, 583 (Tenn. Ct. App. 2010).

Pursuant to Tenn. Code Ann. § 36-6-404, when establishing a residential schedule, a court shall consider:

(1) The parent's ability to instruct, inspire, and encourage the child to prepare for a life of service, and to compete successfully in the society that the child faces as an adult;
(2) The relative strength, nature, and stability of the child's relationship with each parent, including whether a parent has taken greater responsibility for performing parenting responsibilities relating to the daily needs of the child;
(3) The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interests of the child;
(4) Willful refusal to attend a court-ordered parent education seminar may be considered by the court as evidence of that parent's lack of good faith in these proceedings;
(5) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(6) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(7) The love, affection, and emotional ties existing between each parent and the child;

(8) The emotional needs and developmental level of the child;

(9) The character and physical and emotional fitness of each parent as it relates to each parent's ability to parent or the welfare of the child;

(10) The child's interaction and interrelationships with siblings and with significant adults, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(11) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(12) Evidence of physical or emotional abuse to the child, to the other parent or to any other person;

(13) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(14) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(15) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(16) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-404(b) (2010).

From a review of the record, it is apparent that both Mother and Father are well-educated professionals who are strongly positioned to care for the Children. Mother and Father live in close proximity. Mother and Father work at the same medical center. Both parents have demonstrated the ability to attend to the special needs of the Children.

Father argues strenuously on appeal that the Trial Court, in its fashioning of the residential schedule, failed to account fully for his active involvement in the upbringing of the Children. Furthermore, Father argues that Mother has vastly minimized his actual level of participation. Also, Father notes, and, we acknowledge, that for a period leading up to trial, the parties were operating under a residential schedule which afforded Mother more time with the Children.

Nevertheless, a trial court is not charged simply with calculating the amount of time each parent spent with the children over the course of their lives, then applying that ratio to form a residential schedule. The children's best interest is paramount. In this case, the Children have various special needs. The Trial Court found that equal time would be disruptive to the Children in light of these special needs. Furthermore, the Trial Court found that Mother was the 'mover and shaker' with respect to the Children. Given the testimony regarding Father's moonlighting, this was not an illogical conclusion. Such a finding does not imply that Father was an absentee or derelict father, simply that Mother had more of a consistent presence in the lives of the Children. This was a legitimate consideraton in keeping with the statutory factors.

It would be instructive at this point to recall our standard of review in this case. The proper standard here, as both parties agree, is abuse of discretion. In *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515 (Tenn. 2010), the Supreme Court discussed the abuse of discretion standard at length, stating:

> The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal. *Beard v. Bd. of Prof'l Responsibility*, 288 S.W.3d 838, 860 (Tenn. 2009); *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000). It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999). Thus, it does not permit reviewing courts to second-guess the court below, *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999), or to substitute their discretion for the lower court's, *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003); *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002).

> Discretionary decisions must take the applicable law and the relevant facts into account. *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008); *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996). An abuse of discretion occurs when a court strays beyond the

applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007). A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence. *State v. Ostein*, 293 S.W.3d 519, 526 (Tenn. 2009); *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d at 358; *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d at 42.

To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions. *Flautt & Mann v. Council of Memphis*, 285 S.W.3d 856, 872-73 (Tenn. Ct. App. 2008) (quoting *BIF, a Div. of Gen. Signal Controls, Inc. v. Service Constr. Co.*, No. 87-136-II, 1988 WL 72409, at *3 (Tenn. Ct. App. July 13, 1988) (No Tenn. R. App. P. 11 application filed)). When called upon to review a lower court's discretionary decision, the reviewing court should review the underlying factual findings using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d) and should review the lower court's legal determinations de novo without any presumption of correctness. *Johnson v. Nissan N. Am., Inc.*, 146 S.W.3d 600, 604 (Tenn. Ct. App. 2004); *Boyd v. Comdata Network, Inc.*, 88 S.W.3d at 212.

*Beecher*, 312 S.W.3d at 524-25.

The evidence in the record does not preponderate against any of the Trial Court's findings relevant to the issue before us. In the instant case, we cannot say that the Trial Court abused its discretion. The residential schedule entered by the Trial Court does not defy reason, logic or the law. The Children have special needs, which the Trial Court found were best addressed with the schedule as set by the Trial Court rather than by an

alternating weekly schedule. As to Mother's having more time with the Children than Father, this was a decision upon which reasonable minds could disagree. That is the essence of a proper discretionary decision by a trial court. Given the abuse of discretion standard, and the reasonableness of the Trial Court's decision in light of that standard, we affirm the judgment of the Trial Court.

### Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against appellant, Juan Francisco Rodriguez, and his surety, if any.

_____
D. MICHAEL SWINEY, JUDGE